PARKE, DAVIS & CO. v. UNITED STATES.

(Circuit Court of Appeals, Fifth Circuit. February 4, 1919. Rehearing Denied March 15, 1919.)

No. 3083.

1. ADULTERATION ⬚4—INSECTICIDE ACT.
    In determining whether an insecticide is adulterated or misbranded within Act April 26, 1910 (Comp. St. §§ 8765–8777), where words in everyday use are put upon the labels, they are to be given their ordinary meaning so far as they have one, unless it is disclosed that their use was under such circumstances that they conveyed a different meaning.

2. ADULTERATION ⬚4—INSECTICIDE ACT—CONSTRUCTION.
    The use of the name "Insect Powder" on labels does not constitute a profession of standard or quality, nor that the package does not contain ingredients lacking in purity or insecticidal value, so as to constitute either adulteration or misbranding because of the presence of such ingredients within Insecticide Act April 26, 1910, §§ 7, 8 (Comp. St. §§ 8771, 8772).

    Sheppard, District Judge, dissenting.

In Error to the District Court of the United States for the Eastern District of Louisiana; Rufus E. Foster, Judge.

Criminal prosecution by the United States against Parke, Davis & Co. Judgment of conviction, and defendant brings error. Reversed.

Charles M. Woodruff, of Detroit, Mich., and Richard B. Montgomery, of New Orleans, La., for plaintiff in error.

Jos. W. Montgomery, U. S. Atty., and J. D. Dresner, Asst. U. S. Atty., both of New Orleans, La.

Before WALKER and BATTS, Circuit Judges, and SHEPPARD, District Judge.

WALKER, Circuit Judge. This was a prosecution instituted by an information containing two counts, each of which charged that the plaintiff in error, Parke, Davis & Co., a corporation, on or about March 4, 1912, did wrongfully and unlawfully ship and cause to be shipped and transported for sale, from New Orleans, La., to the purchaser thereof, to wit, the Southern Drug Company, Houston, Tex., a certain insecticide, to wit, a quantity of so-called insect powder, which when so shipped bore the following label on the packages containing the same:

"1 lb. Net. Parke, Davis & Co. 90, 92 & 94 Maiden Lane, New York. [P. D. & Co. Brand Insect Powder P. D. & Co.]"

⬚For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The first count charged that said insect powder, when so shipped, labeled as aforesaid, was adulterated in the following manner and particulars, to wit:

"That said label indicated that the said insecticide was a pure and genuine insect powder, whereas, in truth and in fact, it was not a pure and genuine insect powder, but the strength and purity of said so-called insect powder, when shipped as aforesaid, then and there fell below the professed standard of quality under which it was sold, in that it was sold as a pure and genuine insect powder, whereas said insect powder contained an excessive and unlawful amount and quantity of pyrethrum stems in violation of law and the Insecticide Act 1910."

The second count charged that said insect powder, when so shipped, labeled as aforesaid, was misbranded in the following manner and particulars, to wit:

"That said label then and there indicated that the so-called insect powder was a pure and genuine insect powder, whereas, in truth and fact, it was not a pure and genuine insect powder, but then and there contained an excessive and unlawful amount and quantity of pyrethrum stems in violation of law and the Insecticide Act 1910, and said label therefore bore a false statement as to the so-called insect powder, and as to the ingredients thereof, and was such as to deceive and mislead the purchaser into believing that the said so-called insect powder was pure and genuine, when in truth and in fact it was not pure and genuine and of the standard known to the trade as insect powder."

The question of the sufficiency of the information was raised by a motion to quash and also by demurrer. The motion and the demurrer were overruled. There was a trial resulting in the conviction of the defendant.

Each count of the information undertakes to charge an offense under the Act of Congress of April 26, 1910, known as the Insecticide Act, c. 191, 36 Stat. 331 (Comp. St. §§ 8765–8777). That act includes a prohibition of the shipment in interstate commerce of adulterated or misbranded insecticides, and makes such a shipment a misdemeanor. It defines the terms "insecticide," "adulterated," and "misbranded," as used in the act. The following are provisions of the act:

"The term 'insecticide' as used in this act shall include any substance or mixture of substances intended to be used for preventing, destroying, repelling, or mitigating any insects which may infest vegetation, man or other animals, or households, or be present in any environment whatsoever.

"For the purpose of this act an article shall be deemed to be adulterated—

"*Paris Green.*

"In the case of paris green: First, if it does not contain at least fifty per centum of arsenious oxide; second, if it contains arsenic in water-soluble forms equivalent to more than three and one-half per centum of arsenious oxide; third, if any substance has been mixed and packed with it so as to reduce or lower or injuriously affect its quality or strength.

"*Lead Arsenate.*

"In the case of lead arsenate: First, if it contains more than fifty per centum of water; second, if it contains total arsenic equivalent to less than twelve and one-half per centum of arsenic oxid ($As_2O_5$); third, if it contains arsenic in water-soluble forms equivalent to more than seventy-five one-hundredths per centum of arsenic oxid ($As_2O_5$); fourth, if any substances have been mixed and packed with it so as to reduce, lower, or injuriously affect its quality or strength: Provided, however, that extra water may be added to lead arsenate (as described in this paragraph) if the resulting mixture is

labelled lead arsenate and water, the percentage of extra water being plainly and correctly stated on the label.

*"Other Insecticides or Fungicides.*

"In the case of insecticides or fungicides, other than paris green and lead arsenate: First, if its strength or purity fall below the professed standard or quality under which it is sold; second, if any substance has been substituted wholly or in part for the article; third, if any valuable constituent of the article has been wholly or in part abstracted; fourth, if it is intended for use on vegetation and shall contain any substance or substances which, although preventing, destroying, repelling, or mitigating insects, shall be injurious to such vegetation when used.

"The term 'misbranded' as used herein shall apply to all insecticides, paris greens, lead arsenates, or fungicides, or articles which enter into the composition of insecticides or fungicides, the package or label of which shall bear any statement, design, or device regarding such article or the ingredients or substances contained therein which shall be false or misleading in any particular, and to all insecticides, paris greens, lead arsenates, or fungicides which are falsely branded as to the state, territory, or country in which they are manufactured or produced.

"That for the purpose of this act an article shall be deemed to be misbranded—

＊　　＊　　＊　　＊　　＊　　＊　　＊　　＊　　＊　　＊

"In the case of insecticides (other than paris greens and lead arsenates) and fungicides: First, if it contains arsenic in any of its combinations or in the elemental form and the total amount of arsenic present (expressed as per centum of metallic arsenic) is not stated on the label; second, if it contains arsenic in any of its combinations or in the elemental form and the amount of arsenic in water-soluble forms (expressed as per centum of metallic arsenic) is not stated on the label; third, if it consists partially or completely of an inert substance or substances which do not prevent, destroy, repel, or mitigate insects or fungi and does not have the names and percentage amounts of each and every one of such inert ingredients plainly and correctly stated on the label: Provided, however, that in lieu of naming and stating the percentage amount of each and every inert ingredient the producer may at his discretion state plainly upon the label the correct names and percentage amounts of each and every ingredient of the insecticide or fungicide having insecticidal or fungicidal properties, and make no mention of the inert ingredients, except in so far as to state the total percentage of inert ingredients present."

The act provides for the Secretary of the Treasury, the Secretary of Agriculture, and the Secretary of Commerce and Labor making uniform rules and regulations for carrying out the provisions of the act. The term "insect powder" is not found in the act.

[1] The subjects of the alleged shipments were packages labeled as alleged in the information. The words on the label, except those stating weight and the name and address of the defendant, were: "P. D. & Co. Brand Insect Powder P. D. & Co." In the connection in which the letters "P. D." are found on the label, they are to be taken as used as the initials of a previously stated name. The bracketed words of the label import insect powder of the named brand. The term "insect powder" is one which was in common use long before the enactment of the statute. Judicial cognizance is taken of the meaning of words or terms in common use. The following is the definition of the term given in the Century Dictionary: "A dry powder used to kill or expel insects; an insecticide or insectifuge." That definition is followed by this statement:

"The principal kinds, used against museum and household pests, are the Persian, made from the dry flowers of pyrethrum roseum; the Dalmatian

(also called Persian), from those of pyrethrum cinerariae-folium; and the Californian, also made from the last-named plant, all of which are known as buhach."

Where words in everyday use are put upon labels, they are to be given their ordinary and customary meaning so far as they have one, unless it is disclosed that their use was under such circumstances that they conveyed a different meaning. Libby, McNeill & Libby v. United States, 210 Fed. 148, 127 C. C. A. 14; United States v. 150 Cases of Fruit Puddine (D. C.) 211 Fed. 360. The information does not allege any facts or circumstances from which it could be inferred that the term "insect powder," as used in the label, had a meaning other than the one it has in everyday use. If the word "insecticide" had been used, it would have conveyed the same meaning, except that it would not have indicated that the thing referred to was a dry powder. The use of either of the words is not inconsistent with the thing referred to being a mixture containing ingredients lacking in purity or insecticidal value. And the use of either of them does not constitute a profession of standard or quality or a statement of the ingredients or substances contained in the thing referred to. The statute specifies ingredients of paris green and lead arsenate the presence or absence of which is given such effect that those articles are to be deemed adulterated. Those provisions are not applicable to insecticides other than the ones named. So far as appears, at the time of the alleged shipments, no regulation had been prescribed which purported to deal with the use of the word "insect powder" on labels.

[2] The first count of the information undertook to charge that the subject of the alleged shipment was adulterated within the meaning of the provision of the statute that an article should be deemed to be adulterated "if its strength or purity fall below the professed standard or quality under which it is sold." It does not attempt to charge that the thing shipped was adulterated within the meaning of any other clause of the statute's definition of that term. That count failed to state facts constituting the offense attempted to be charged, in that it failed to show that the alleged label or any part of it imported a professed standard or quality under which the subject of the alleged shipment was sold. It imported no more than that the thing referred to was a powder intended to be used to kill, repel, or mitigate insects.

The second count of the information undertook to charge that the subject of the alleged shipment was "misbranded" within the meaning of that part of the statute's definition of that term which makes it apply to all insecticides, etc., "the package or label of which shall bear any statement, design or device regarding such article or the ingredients or substances contained therein which shall be false or misleading in any particular." There was no attempt to charge that the thing shipped was misbranded within the meaning of any other clause of the statute's definition of that term. The charge as made in that count involves the assumption that the word or term "insect powder" amounts to a statement which was false and misleading, though the thing referred to is one which properly is identified or

described by that name as it applied ordinarily and customarily. That assumption is unwarranted.

The conclusion is that the averments of neither count of the information showed the commission of any criminal offense. The court erred in ruling otherwise. Its judgment is reversed.

SHEPPARD, District Judge (dissenting). The evidence at the trial established the trade meaning of "professed standard" of insecticide, namely, a powder made of the flower heads of the pyrethrum plant. The evidence further showed that the introduction of more than 10 per cent. of stems of the plant into the powder reduced its purity and efficacy relatively in proportion to the quantity of powdered stems put into the article. The insect powder of defendant put on the trade was shown to contain 50 per cent. of powdered stems. Stems were shown to have only a slight insecticidal value, and by the terms of the statute the percentage amount of the inert ingredient should be plainly stated on the label. I think the information charges an offense under the statute.

The evidence in my opinion made out a case of at least misbranding, and the judgment should not be disturbed. United States v. Antikamnia Co., 231 U. S. 654, 34 Sup. Ct. 222, 58 L. Ed. 419, Ann. Cas. 1915A, 49.